<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| FELICIA NOVICK *et al.*, | |
| Plaintiffs, | |
| v. | No. 25cv4804 (EP) (JBC) |
| UNILEVER UNITED STATES, INC. | **OPINION** |
| Defendant. | |

**PADIN, District Judge.**

Plaintiffs Felicia Novick and Kalman Rosenfeld bring this putative class action against Defendant Unilever United States, Inc. under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2). *See* D.E. 1 ("Complaint" or "Compl."). Plaintiffs allege that the "hypoallergenic" and "sensitive skin" representations on Unilever's Dove Sensitive Skin Body Wash are false and misleading because the body wash contains ingredients that are known skin sensitizers that cause allergic reactions, and that Plaintiffs suffered an economic injury by paying for a product that was not as represented. *See id.* ¶¶ 1–7, 129. Plaintiffs assert ten counts under New Jersey, New York, and California consumer-protection and warranty law, as well as claims for common-law fraud and unjust enrichment.

Presently pending before the Court is Unilever's Motion to Dismiss. D.E. 20-1 ("Motion" or "Mot.").[1] Plaintiffs oppose the Motion. D.E. 28 ("Opposition" or "Opp'n"). Unilever replies. D.E. 29 ("Reply"). The Court decides the Motion without oral argument. *See* Fed. R. Civ. P. 78;

---

[1] Unilever filed its Notice of Motion to Dismiss at D.E. 20.

L. Civ. R. 78.1(b).  For the reasons below, the Court will **GRANT in part** and **DENY in part** Unilever's Motion.

## I.   BACKGROUND[2]

### A.   The Parties and the Product

Unilever is incorporated in Delaware with its principal place of business in Englewood Cliffs, New Jersey.  Compl. ¶ 33.  Unilever manufactures, advertises, distributes, and sells products under the "Dove" brand name.  *Id.*  Unilever's Dove products are sold both online and at stores throughout the United States.  *Id.*  Unilever sells a "Dove brand Sensitive Body Wash," which is labeled as "hypoallergenic" and for "sensitive skin" on the front (the "Product"):

 

*Id.* ¶¶ 1, 5, 33.

---

[2] For purposes of Unilever's Motion, the Court accepts the factual allegations of the Complaint as true and draws all inferences in the light most favorable to the Plaintiffs.  *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

Plaintiff Kalman Rosenfeld has been domiciled in New Jersey since 2022, before which he was domiciled in New York. *Id.* ¶ 11. Rosenfeld "purchased the Product from CVS and Duane Reade in Brooklyn, New York and CVS and Walmart in Toms River, New Jersey" and "estimates he purchased the Product at least four or five times, with the earliest purchase around 2020 and the most recent in January 2025." *Id.* Rosenfeld and his son have sensitive skin and experience skin irritation and dermatitis; his son experiences severe atopic eczema. *Id.* ¶ 13.

Plaintiff Felicia Novick is domiciled in California. *Id.* ¶ 22. Novick "purchased the Product at least ten times from around December 2023 through January 2025, at CVS, Target, and Walmart stores in Van Nuys and West Hills, California." *Id.* Novick has sensitive skin and has suffered from skin irritation, dermatitis, and eczema. *Id.* ¶ 24.

According to the Complaint, the Product "contains substances classified by reputable authorities as skin sensitizers," *id.* ¶ 63, and the Product itself is "a skin sensitizer according to the scientific and regulatory definition of a skin sensitizer," *id.* ¶ 6. "The scientific and regulatory definition of a skin sensitizer is a substance that causes sensitization by skin contact in a substantial number of persons based on human evidence or appropriate animal testing." *Id.* ¶ 56. Plaintiffs do not cite or direct the Court to any manner of testing conducted on the skin sensitizers allegedly in the Product. *See id.*

A skin sensitizer "may elicit an allergic response at concentrations smaller than 0.1% in individuals who are already sensitized to the chemical," making the "entire product mixture" a skin sensitizer. *Id.* ¶ 57. In short, a "product that is a skin sensitizer is not hypoallergenic and is not suitable for sensitive skin." *Id.* ¶ 58. The U.S. Food and Drug Administration ("FDA"), however, has not defined or regulated using the term "hypoallergenic." *Id.* ¶ 41.

Plaintiffs claim they saw, relied upon, and believed the "hypoallergenic" and "sensitive skin" label representations, stating that the labels were significant reasons for their purchases. *Id.* ¶¶ 12, 23.  Plaintiffs also claim they would not have purchased the Product, or would not have paid the same price, had they "known that the Product was not hypoallergenic or appropriate for sensitive skin" but would purchase in the future if Unilever "reformulated the Product such that its hypoallergenic and sensitive skin representations were truthful." *Id.* ¶¶ 14–20, 25–31.

Plaintiffs do not claim that the Product caused their skin conditions; Plaintiffs do allege, however, that Rosenfeld's son's and Novick's skin conditions "were not alleviated and may have been prolonged because of the product." *Id.* ¶¶ 19, 30.  Both Rosenfeld and Novick concede that they do "not know with 100% certainty whether what seemed like skin irritation or dermatitis was in fact an allergic response to an ingredient in a personal care product." *Id.* ¶¶ 14, 25.  "Like similarly situated consumers," Plaintiffs do "not know the identity of every ingredient" to which their families "are allergic . . . [and do] not know [to] which ingredients" they or their families "may develop an allergy." *Id.* ¶¶ 15, 26.

Specifically, Plaintiffs allege that the Product contains at least six skin sensitizers in amounts "that can be reasonably expected to induce an allergic response in a significant number of people, and especially so in the [Product's] intended customer base." *See id.* ¶¶ 63–80. According to Plaintiffs, the six skin sensitizers[3] are listed on the back of the Product:

---

[3] Collectively, the "Skin Sensitizers."

INGREDIENTS/INGRÉDIENTS : WATER (EAU), SODIUM LAUROYL ISETHIONATE, SODIUM METHYL LAUROYL TAURATE, COCAMIDOPROPYL BETAINE, LAURIC ACID, SODIUM HYDROXYPROPYL STARCH PHOSPHATE, HYDROGENATED SOYBEAN OIL, GLYCINE SOJA (SOYBEAN) OIL, SODIUM CHLORIDE, GLYCERIN, STEARIC ACID, PALMITIC ACID, HYDROGENATED VEGETABLE GLYCERIDES, GLYCERYL STEARATE, HYDROXYSTEARIC ACID, SODIUM BENZOATE, GUAR HYDROXYPROPYLTRIMONIUM CHLORIDE, FRAGRANCE (PARFUM), CITRIC ACID, CAPRYLOYL GLYCINE, UNDECYLENOYL GLYCINE, SODIUM GLUCONATE.

*Id.* ¶ 72.

Fragrance is "a leading cause of allergic contact dermatitis" according to the American Academy of Dermatology ("AAD"), which estimates that "about 2.5 million Americans have fragrance allergies." *Id.* ¶ 64. The Product allegedly contains the fragrance chemical Tetramethyl Acetyloctahydronaphthalenes (marketed as Iso E. Super or Timbersilk) that "are considered known skin sensitizers and allergens, and are categorized as such." *Id.* ¶ 69.[4]

Cocamidopropyl betaine is a soap (surfactant) and is present at concentrations of 1–10% in the Product, per Unilever's Safety Data Sheets.[5] "Cocamidopropyl betaine has been recognized as a Category 1 skin sensitizer by reputable authorities, based on positive animal and/or human testing" and was "named the Allergen of the Year in 2004 by the American Contact Dermatitis Society." *Id.* ¶ 74. According to Plaintiffs, cocamidopropyl betaine "is also a skin irritant and causes Category 1 eye damage" and "is suspected of damaging fertility or the unborn child." *Id.* ¶ 75.

---

[4] Plaintiffs point to consumer reviews "to confirm consumers' surprise and disappointment that the Product Defendant markets as 'hypoallergenic' and suitable for 'sensitive skin' would have such a high concentration of fragrance and chemicals, and would so routinely cause allergic reactions." *Id.* ¶ 70.

[5] Plaintiffs do not include a link to or attach Unilever's Safety Data Sheets.

Citric acid is a "common food ingredient" for which "skin contact is known to cause allergic reactions in humans" and "has been reported to cause Category 1B skin corrosion, meaning that it irreversibly damages the skin after short exposure," as well as Category 1 eye damage. *Id.* ¶ 76.  Plaintiffs allege that, in animal tests, citric acid "caused visible necrosis after less than 1 hour of exposure." *Id.*

Glycerin is a chemical which contains "similarity to other known skin sensitizers [and] is a suspected skin sensitizer" that is "classified as a skin and eye irritant" and "is known to cause eczema in humans." *Id.* ¶ 77.

Glyceryl stearate is a "skin and eye irritant" that "caused erythema, edema, atonia, desquamation, and/or fissuring" in animal testing on rabbits. *Id.* ¶ 78.

Sodium benzoate is "a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons" and is a "Category 2 eye irritant." *Id.* ¶ 79.

Plaintiffs concede that "many of the Product's ingredients are permitted in body care products" but claim that Unilever "falsely and misleadingly claimed the Product and its ingredients are 'hypoallergenic' and suitable for 'sensitive skin' when they are not." *Id.* ¶ 81.

## B.    The Challenged Representation

Plaintiffs allege that the Product's front label representing that it is "hypoallergenic" and intended for "sensitive skin" is "false and misleading." *Id.* ¶¶ 6, 50.  Plaintiffs point to the Product's website, which "makes a variety of claims regarding how gentle the Product is for consumers' skin." *Id.* ¶ 51.  Further, Plaintiffs allege that Unilever makes various claims about the product on Amazon, including that the Product "is ultra mild" and that it "is made with 100% gentle cleansers and is the #1 dermatologist recommended body wash." *Id.*  The Product's claims

6

also appear on the websites for other stores, including Target and CVS, stating that the Product "soothes dryness without irritation" so consumers' "sensitive skin won't be seeing red." *Id.* ¶ 52.

On its website, Unilever stresses product safety, representing that it selects only ingredients that it has individually assessed to be safe. *Id.* ¶ 54. Unilever's website (not the Product's label) claims transparency in fragrance allergens and that the Product "meet[s] global standards set by the International Fragrance Association (IFRA)." *Id.* ¶ 55. Unilever "holds itself out to the public as a trusted expert in the area of hypoallergenic, safe, mild, and gentle personal care products." *Id.* ¶ 96.

According to Plaintiffs, consumers expect a product labeled as "hypoallergenic" to contain no skin sensitizers that could elicit an allergic response in sensitized individuals. *Id.* ¶¶ 59–60. Even a "minute amount of chemical allergen is enough to cause a full-blown allergic response in sensitized individuals." *Id.* As such, "consumers seeking *hypoallergenic* products . . . expect that the product does not contain *any* skin sensitizers." *Id.* Plaintiffs allege that "hypoallergenic" and "sensitive skin" communicate to reasonable consumers that the Product:

> (a) is not a skin sensitizer itself; (b) will not cause skin irritation or corrosion or contact dermatitis when used as directed by its intended users; (c) does not contain a significant amount of ingredients known to cause skin irritation or corrosion or contact skin dermatitis in its intended users; and (d) does not contain skin sensitizer ingredients in an amount that can reasonably be expected to induce an allergic response in a significant number of its intended users or in sensitized individuals.

*Id.* ¶ 61. In other words, the terms "hypoallergenic" and "sensitive skin" communicate to "reasonable consumers that the Product is less likely to cause an allergic reaction in its intended users" than competing products that do not claim to be hypoallergenic. *Id.* ¶ 62.

Because the Product allegedly contains the Skin Sensitizers, the "hypoallergenic" and "sensitive skin" representations are false and misleading and contradictory to the terms' meanings. *Id.* ¶¶ 62, 82. In comparing with other products, Plaintiffs point to "Defendant's Dove brand

7

Sensitive Skin Body Bar . . . which contains neither fragrance chemicals nor a 'hypoallergenic' representation on its label and packaging." *Id.* ¶ 83. Plaintiffs add that Kroger sells a "copycat" sensitive skin bodywash (the "Kroger Copycat")—marketed as comparable to the Product—but declines to claim it is "hypoallergenic" anywhere on its front label. *Id.* ¶ 105.

According to Plaintiffs, Unilever's "conduct deceived and/or was likely to deceive the public" because consumers "believe[d] the Product was hypoallergenic and suitable for sensitive skin, as labeled." *Id.* ¶ 84. Plaintiffs note that there "is nothing on the front label (like an asterisk) disclaiming or modifying the 'hypoallergenic' and 'sensitive skin' representations." *Id.* ¶ 87.

Plaintiffs explain that neither term is "ambiguous or vague to reasonable consumers." *Id.* ¶ 87. Consumers are less likely to read the ingredient lists on personal care products, and they would "not know the true nature of the ingredients" even if they were to flip the Product and read its ingredient list. *Id.* ¶¶ 87–88. According to Plaintiffs, Unilever deceptively conceals material facts about the Product, including that the "Product contains sensitizers, irritants, [and] toxins" thus making the Product not hypoallergenic or suitable for sensitive skin. *Id.* ¶¶ 92–93.

Plaintiffs contend that the alleged misrepresentations are "material in that a reasonable person would . . . be induced to act upon such information in making purchase decisions," *id.* ¶ 117, and that Unilever intentionally made the misrepresentations knowing that consumers would rely on them, *id.* ¶¶ 99–104. "Plaintiffs and class members reasonably relied to their detriment on Defendant's misleading representations and omissions" and Defendant is "likely to continue to deceive and mislead Plaintiffs, the Class Members, reasonable consumers, and the general public." *Id.* ¶¶ 113–14.

8

### C.  Procedural History

Originally, Plaintiffs brought ten claims under New Jersey, New York, and California consumer-protection and warranty law, as well as claims for common-law fraud and unjust enrichment.  During the pre-motion letter process, Plaintiffs withdrew their claims for injunctive and declaratory relief, and Rosenfeld also withdrew his New York implied warranty claim.  *See* D.E. 14.

Unilever then moved to dismiss.  Mot.  The Motion is now fully briefed. *See* Opposition and Reply.  In its Reply, Unilever withdrew its New York express warranty notice argument because Plaintiffs' Opposition revealed their pre-suit notice.  Reply at 6 n.3.  Also in its Reply, Unilever treated its standing challenge as mooted by Plaintiffs' concession that nationwide and multi-state claims will proceed under New Jersey law.  Reply at 1 n.1; Opp'n at 3–5.

### D.  Classes and Counts

Plaintiffs define six classes of putative plaintiffs:

- Nationwide Class:  All people in the United States who purchased the Product for personal or household use during the last four years.

- California Subclass:  All people in California who purchased the Product for personal or household use during the last four years.

- New York Subclass:  All people in New York who purchased the Product for personal or household use during the last four years.

- New Jersey Subclass:  All people in New Jersey who purchased the Product for personal or household use during the last four years.

- Multi-State Warranty Class:  All people who purchased the Product for personal or household use (1) in Alaska, Arkansas, California, Delaware, District of Columbia,

Hawaii, Indiana, Kansas, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, North Dakota, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Virginia, or Wyoming within the applicable statute of limitations; or (2) in Colorado or Massachusetts within the applicable statute of limitations.

- Multi-State Consumer Protection Class:  All people who purchased the Product for personal or household use (1) in the states of Michigan, Minnesota, or New Jersey within the applicable statute of limitations; (2) in the state of Missouri within the applicable statute of limitations; (3) in the states of California, Florida, Massachusetts, or Washington within the applicable statute of limitations; or (4) in the states of Illinois and New York within the applicable statute of limitations.

Compl. at 30–31.

Plaintiffs assert ten counts:

- Count One:  On behalf of Novick and all other class members in the Multi-State Consumer Protection Class and the California Subclass, a claim for unlawful, unfair, and fraudulent business practices under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*;

- Count Two:  On behalf of Novick and all other class members in the Multi-State Consumer Protection Class and the California Subclass, a claim for false and misleading advertising under California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500 *et seq.*;

- Count Three:  On behalf of Novick and all other class members in the Multi-State Consumer Protection Class, and the California Subclass, a claim for unfair and

deceptive practices under California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.* (UCL, FAL, and CLRA claims collectively, the "CA Consumer Laws");

- Count Four:  On behalf of Rosenfeld and all other class members in the Multi-State Consumer Protection Class and the New York Subclass, a claim for deceptive acts and practices under New York General Business Law ("NYGBL") § 349;

- Count Five:  On behalf of Rosenfeld and all other class members in the Multi-State Consumer Protection Class and the New York Subclass, a claim for false advertising under NYGBL § 350;

- Count Six:  On behalf of Rosenfeld and all other class members in the Multi-State Consumer Protection Class and the New Jersey Subclass, a claim for affirmative misrepresentation and fraudulent omission under the New Jersey Consumer Fraud Act ("NJCFA"), N.J. Stat. Ann. § 56:8-2;

- Count Seven:  On behalf of Plaintiffs and all other class members in the Multi-State Consumer Protection Class and the New Jersey and California Subclasses for breach of implied warranty;

- Count Eight:  On behalf of Plaintiffs and all other class members in the Multi-State Consumer Protection Class and the New Jersey, New York, and California Subclasses for breach of express warranty;

- Count Nine:  On behalf of Plaintiffs and all other class members (including all subclasses) for unjust enrichment; and

- Count Ten:  On behalf of Plaintiffs and all other class members (including all subclasses) for fraud by omission/intentional misrepresentation.

11

*Id*. at 35–48.

## II.  LEGAL STANDARDS

### A.  Federal Rule of Civil Procedure 12(b)(1)

Under Federal Rule of Civil Procedure 12(b)(1), issues with subject matter jurisdiction may be raised at any time.  *McCalley v. Samsung Elecs. Am., Inc.*, No. 07-2141, 2008 WL 878402, at *2 (D.N.J. Mar. 31, 2008).  "Because at issue in a factual 12(b)(1) motion is the trial court's power to hear the case, the trial court is free to weigh the evidence, and no presumptive truthfulness attaches to plaintiff's allegations."  *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

A motion to dismiss for lack of standing is "properly brought pursuant to [Federal] Rule [of Civil Procedure] 12(b)(1)."  *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014).  "Article III governs constitutional standing and limits [federal courts'] jurisdiction to actual cases or controversies."  *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 358 (3d Cir. 2015) (internal quotation marks omitted).  A plaintiff can establish they have standing to sue by demonstrating: (1) an injury in fact, (2) a sufficient causal connection between the injury claimed and the conduct complained of, and (3) a likelihood that a favorable decision would redress the party's complained-of injury.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

### B.  Federal Rule of Civil Procedure 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a court accepts all well-pleaded factual allegations as true, construes the complaint in the plaintiff's favor, and determines "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  *Phillips*, 515 F.3d at 233 (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)).  "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the

complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). Courts may not consider "[f]actual claims and assertions raised by a defendant." *Doe v. Princeton Univ.*, 30 F.4th 335, 345 (3d Cir. 2022).

To survive a Rule 12(b)(6) challenge, a plaintiff's claims must be facially plausible, meaning that "the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Although there is no "'probability requirement,'" plaintiff's claims must do more than present "a sheer possibility that a defendant has acted unlawfully." *Id.* The allegations must include "more than labels and conclusions." *Twombly*, 550 U.S. at 555.

Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678.

### C.    Federal Rule of Civil Procedure 9(b)

Plaintiffs bring multiple claims rooted in fraud. *See* Compl. Fraud-based claims are "subject to heightened specificity requirements" under Federal Rule of Civil Procedure 9(b). *Ponzio v. Mercedes-Benz USA, LLC*, 447 F. Supp. 3d 194, 225 (D.N.J. 2020) (quoting *MDNet, Inc. v. Pharmacia Corp.*, 147 F. App'x 239, 245 (3d Cir. 2005)). For fraud-based claims, the plaintiff must state with particularity the circumstances constituting fraud or mistake such that the defendant is "on notice of the precise misconduct with which they are charged." *Id.* (internal

13

quotation marks omitted).  Though the plaintiff need not plead "every material detail" and may allege the defendant's mental state generally, "some measure of substantiation" is required.  *Id.* (internal quotation marks omitted).  "At a minimum, [the] plaintiff 'must allege who made a misrepresentation to whom and the general content of the misrepresentation.'" *Id.* at 226 (quoting *Lum v. Bank of Am.*, 361 F.3d 217, 224 (3d Cir. 2004)).

## III.    DISCUSSION

The Court begins with the threshold question of standing and concludes that Plaintiffs have Article III standing under a price premium theory of economic injury.  The Court then turns to the question at the heart of this case:  whether the Product's "hypoallergenic" and "sensitive skin" labeling could mislead a reasonable consumer.  That question governs the claims Plaintiffs bring under the NJCFA, NYGBL, and CA Consumer Laws (collectively, "the Consumer Fraud Claims").[6]  After finding that Plaintiffs plausibly allege that the Product's label is misleading, the Court applies that finding to the Consumer Fraud Claims, the warranty claims, the unjust enrichment claim, and the common-law fraud claim.

### A.    Standing

Unilever raises two standing arguments: (1) Plaintiffs lack standing on behalf of purchasers in states where no named Plaintiff bought the Product; and (2) Plaintiffs have not pleaded an economic injury in fact. The Court addresses them in turn.

#### 1.    *Multi-state class standing*

The Court starts with standing as a threshold issue.  Unilever opened its Motion to Dismiss by arguing that Plaintiffs lack Article III standing to assert claims on behalf of purchasers in states other than New Jersey, New York, and California—the only states Plaintiffs allege they personally

---

[6] The Consumer Fraud Claims are Counts One through Six.

purchased the Product.  Mot. at 5–6.  In making this argument, Unilever relies on *Rains v. Jaguar Land Rover N. Am., LLC*, No. 22-4370, 2023 WL 6234411, at *4 (D.N.J. Sept. 26, 2023), and *Ponzio*, 447 F. Supp. 3d at 222–23.  Based on these cases, Unilever contends that any nationwide class or state claims other than those in New Jersey, California, and New York should be dismissed because Plaintiffs can only assert "claims on behalf of individuals in states where at least one named Plaintiff has standing for that claim."  *Rains*, 2023 WL 6234411, at *4.

In their Opposition, however, Plaintiffs concede that any common-law claims pursued on behalf of nationwide or multi-state class members would be properly brought under New Jersey state law because that is where Unilever is headquartered.  Opp'n at 3.  And because Rosenfeld purchased the Product in New Jersey, which Unilever does not dispute, "Plaintiffs have mooted Unilever's standing argument."  Reply at 1 n.1.

Whether New Jersey law may govern the claims of absent Nationwide Class members is one for Federal Rule of Civil Procedure 23 class certification.  *Neale*, 794 F.3d at 368–69 (3d Cir. 2015) (discussing nationwide class standing and applicable state law at the Rule 23 certification stage).  Thus, "the Court declines to dismiss the nationwide class allegations because addressing class certification issues prior to a Rule 23 Motion is premature." *Bang v. BMW of N. Am., LLC*, No. 15-6945, 2016 WL 7042071, at *4 (D.N.J. Dec. 1, 2016).

### 2.    *Economic injury in fact*

Unilever also claims Plaintiffs have failed to establish the injury-in-fact prong of the standing inquiry because they have not established economic injury.  "A plaintiff claiming financial harm will easily satisfy the injury in fact showing because such harm is a 'classic' and 'paradigmatic' form of injury in fact." *Serrano v. Campbell Soup Co.*, 773 F. Supp. 3d 127, 146

(D.N.J. 2025) (citation modified). The parties disagree whether Plaintiffs have adequately pleaded, among others, a price premium theory of economic injury. They have.

To allege a price premium theory of injury, a plaintiff must allege facts that "allow[] the court to calculate the financial injury by determining the 'premium' that a plaintiff was induced to pay by unlawful advertisements." *In re Plum Baby Food Litig.*, 637 F. Supp. 3d 210, 225 (D.N.J. 2022) (citing *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Liab. Litig.*, 903 F.3d 278, 283 (3d Cir. 2018)). "At the pleading stage, plaintiffs need not put a price tag on their economic injury." *Serrano*, 773 F. Supp. 3d at 146; *see In re Johnson & Johnson*, 903 F.3d at 287 (discussing that plaintiffs are not "required to allege the *exact* value of [their] economic injury at the pleading stage."). Plaintiffs need only allege facts that "permit a factfinder to determine that [they] suffered at least *some* economic injury." *In re Johnson & Johnson*, 903 F.3d at 287.

Plaintiffs allege that the "hypoallergenic" and "sensitive skin" representations led them to pay more for the Product than they otherwise would have, and that the Product is worth nothing to them because they cannot safely use it. *See* Compl. ¶¶ 104, 129; Opp'n at 24. Unilever contends that Plaintiffs' price premium theory is conclusory and thus fails. According to Unilever, to prove a price premium theory, Plaintiffs must "explain why they believe the [Product] is priced based on its packaging, as opposed to the number of ounces of product in the bottle (or some other metric)" and "how the 'hypoallergenic' or 'sensitive skin' statements factor into the price." Mot. at 24.

Unilever correctly notes that Plaintiffs do not mention an explicit price difference between the Product and the Kroger Copycat in their Complaint. Plaintiffs, however, allege a $0.16 per ounce difference between the Product and the Kroger Copycat. Reply at 10. Because Plaintiffs cannot amend their Complaint through their briefs, the Court will not consider that price difference

16

when deciding the Motion. *Commw. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.").

Unilever next points to *Borenkoff v. Buffalo Wild Wings, Inc.*, No. 16-8532, 2018 WL 502680, at *3 (S.D.N.Y. Jan. 19, 2018) to argue that Plaintiffs' premium theory is merely conclusory. Mot. at 25. Plaintiffs counter that in *Borenkoff*, plaintiff failed to allege "exactly *how* the cost of the items was [a]ffected, or *why* she believes she paid a premium." Opp'n at 24 (citing *Borenkoff*, 2018 WL 502680, at *4). Plaintiffs persuasively argue *how* the value of the Product "plummets to $0 if its intended users cannot use it without risking allergic reactions." Opp'n at 24.

After the Motion's briefing was concluded, Defendant filed a notice of supplemental authority, D.E. 49, regarding *Beyer v. Kenvue Brands LLC*, No. 25-12180, 2026 WL 1396498 (D.N.J. May 19, 2026). There, another court in this District dismissed a materially similar action—where plaintiffs alleged that "hypoallergenic" and "sensitive skin" labels on Aveeno products were unlawfully misleading—for lack of injury in fact. *Id.* at *1. *Beyer* dismissed the complaint on Article III standing and did not reach the merits. *Id.* In denying plaintiff's premium price theory, *Beyer* held that plaintiffs "fail[ed] to identify any comparable, cheaper products that demonstrate that a premium price was in fact paid" and failed to state whether the "premium price [was] compared to non-hypoallergenic products or properly labeled hypoallergenic products." *Id.* at *4.

Plaintiffs here properly plead the facts that doomed *Beyer*. Unlike the plaintiffs in *Beyer*, Plaintiffs identify two cheaper comparators: Dove's own non-hypoallergenic Sensitive Skin Body Bar (Compl. ¶ 83) and the Kroger Copycat explicitly as a "compare to" alternative to the Product (*id.* ¶ 105). That the Complaint does not explicitly allege that either comparator is cheaper is not

17

fatal.  *See id.*  A store brand marketed as the cheaper equivalent is, almost by definition, a comparable, cheaper product.  *See McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 353–54 (3d Cir. 2007) (noting that store brands "positioned as lower cost alternatives" use "compare to" statements that invite consumers to compare the store brand to its national-brand analog); *Perrigo Co. v. United States*, No. 17-737, 2025 WL 3006171, at *3 (W.D. Mich. Sept. 25, 2025) ("Store brand generic products are usually cheaper than the national brands.").

Contrary to Unilever's assertion, there is no requirement that Plaintiffs here—who point to the Kroger Copycat—must state "the *exact* value of [their] economic injury at the pleading stage." *See In re Johnson & Johnson*, 903 F.3d at 287; *In re Riddell Concussion Reduction Litig.*, 121 F. Supp. 3d 402, 414 (D.N.J. 2015) ("Plaintiffs need not identify, at the pleadings stage, the exact price of every [product] they could have purchased but did not.").  Indeed, the bar is lower at this stage:  Plaintiffs "must set forth factual allegations that, if proven true, would permit a factfinder to determine that [they] suffered at least *some* economic injury." *Id.*  It is plausible for a factfinder to determine that Plaintiffs paid a premium price for the Product when compared to the Kroger Copycat.  Thus, Plaintiffs adequately plead standing based on an economic injury because they "paid a premium price for a product that was not as represented."  Compl. ¶ 129.

Plaintiffs set forth other forms of economic injury, *see id.*, but the Court need not reach those injuries because Plaintiffs' premium price theory is adequately pleaded.  *See Huertas v. Bayer US LLC*, 120 F.4th 1169, 1175 n.8 (3d Cir. 2024) (declining to discuss other forms of economic injury because Plaintiff properly pleaded one form of economic injury).

In sum, having found Unilever's standing arguments unpersuasive, the Court proceeds to evaluate Unilever's merits-based claims.

**B.      Plaintiffs Plausibly Allege the Product's Labeling Could Mislead a Reasonable Consumer**

Every Consumer Fraud Claim revolves around one issue:   whether the words "hypoallergenic" on the Product's label could mislead a reasonable consumer.  Unilever asserts that, as a matter of law, the answer is no.  *See* Mot. at 13–21.  Plaintiffs say yes, and regardless, contend that whether the label deceives a reasonable consumer should not be resolved at this stage.  *See* Opp'n at 11–15.

To reconcile this dispute, the Court considers the "reasonable consumer" standard to test Plaintiffs' claims.  The Court then proceeds in two parts.  First, the Court reviews how a reasonable consumer may perceive the Product's "hypoallergenic" label.  Second, the Court asks whether the Complaint plausibly alleges that the Product's label is misleading.  The Complaint clears both.

### 1.      The reasonable consumer standard

Because the reasonable consumer standard is substantially the same in New Jersey, New York, and California, the Court first considers the standard and then applies it to Plaintiffs' claims. The NYGBL asks whether "the deceptive conduct was likely to mislead a reasonable consumer acting reasonably under the circumstances."  *Mantikas v. Kellogg Co.*, 910 F.3d 633, 636 (2d Cir. 2018) (internal quotation marks and citation omitted).  Under the CA Consumer Laws, the "reasonable consumer" standard "requires a plaintiff to show that members of the public are likely to be deceived."  *Serrano*, 773 F. Supp. 3d at 160 (citing *McGinity v. Procter & Gamble Co.*, 69 F.4th 1093, 1097 (9th Cir. 2023)) (citation modified).  New Jersey asks whether "the business practice in question . . . mislead[s] or stand[s] outside the norm of reasonable business practice." *Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84, 96 (D.N.J. 2011).

The standards are substantially the same but diverge in how much a plaintiff must show at the pleading stage.  At the pleading stage, the NYGBL and the CA Consumer Laws both require

allegations that "a *significant portion* of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *McGinity*, 69 F.4th at 1097 (citation and internal quotation marks omitted) (emphasis added); *Wiggins v. Unilever United States, Inc.*, 684 F. Supp. 3d 127, 146 (S.D.N.Y. 2023) (applying the same "significant portion" reasonable consumer standard for NYGBL §§ 349 & 350 claims).   But unlike the NYGBL and the CA Consumer Laws, the NJCFA treats "*capacity* to mislead" as the "prime ingredient" of consumer fraud and does not have the "significant portion" requirement.   *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 17–18, 647 A.2d 454 (1994) (emphasis added).

Unilever itself treats the three reasonable consumer standards as one. Mot. at 11.  Although the standards are substantially the same, the NYGBL and the CA Consumer Laws' "significant portion" test is more demanding than the NJCFA's "capacity to mislead" test.   Thus, if the Product's label clears the two former standards, it also clears the latter.

Under all three jurisdictions, the reasonable consumer test asks how an ordinary consumer—not an "exceptionally acute" or "wary one"—would understand the words on the package. *Souter v. Edgewell Pers. Care Co.*, No. 22-55898, 2023 WL 5011747, at *1 (9th Cir. Aug. 7, 2023) (citing *Hill v. Roll Int'l Corp.*, 128 Cal. Rptr. 3d 109, 116 (Ct. App. 2011)); *Paradowski v. Champion Petfoods USA, Inc.*, No. 22-962, 2023 WL 3829559 (2d Cir. June 6, 2023) (noting that a reasonable consumer does "not stop to analyze but [is] governed by appearances and general impressions") (citation omitted); *Krieger v. Bank of Am., N.A.*, 890 F.3d 429, 445 (3d Cir. 2018) (noting that the reasonable consumer is "not particularly sophisticated") (citation modified).

Whether a label misleads is usually a question of fact, and dismissal is warranted only where "the advertisement itself makes it impossible for the plaintiff to prove that a reasonable

consumer is likely to be deceived." *Whiteside v. Kimberly-Clark Corp.*, 108 F.4th 771, 777 (9th

Cir. 2024); *see Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, 8 F. Supp. 3d 467, 478

(S.D.N.Y. 2014) ("A court may make [a deceptive acts or practices] determination as a matter of

law . . . although usually such a determination is a question of fact."); *Stewart v. Smart Balance,

Inc.*, No. 11-6174, 2012 WL 4168584, at *9 (D.N.J. June 26, 2012) ("Whether the labeling as a

whole is misleading to an average consumer is a question of fact.") (citing *Leon v. Rite Aid Corp.*,

340 N.J. Super. 462, 468 (App. Div. 2001)).

Dismissal at this stage is "rare." *Whiteside*, 108 F.4th at 778; *Hesse v. Godiva Chocolatier,

Inc.*, 463 F. Supp. 3d 453 (S.D.N.Y. 2020) ("Dismissal is warranted only in a rare situation where

it is impossible for the plaintiff to prove that a reasonable consumer was likely to be deceived.")

(internal quotation marks and citation omitted); *Ajayi v. CULA, LLC*, No. 23-4014, 2026 WL

262645, at *9 (D.N.J. Feb. 2, 2026) ("Whether an act has the capacity to mislead and stands outside

the norm of reasonable business practices are usually jury questions.").

The Court proceeds by considering how a reasonable consumer may understand

"hypoallergenic," and then discusses whether the Complaint plausibly alleges that the Product's

labeling is misleading.

### 2.    The Product's "hypoallergenic" representation

The Court begins with the meaning of "hypoallergenic," as Unilever's lead argument is

definitional.  Unilever contends that "hypoallergenic" cannot mislead anyone because the word is

inherently relative and "not an objective guidance about the specific amount of any ingredient in

a product." Mot. at 16–19.  Unilever notes that the prefix "hypo-" means "less than," not "zero,"[7]

---

[7] *Hypo-*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/hypo (last visited June 16, 2026) (as relevant here, defining the prefix "hypo-" as "under; beneath; down" and "less than normal or normally").

and therefore, a reasonable consumer would read "hypoallergenic" to promise only that the Product is *less* likely to cause a reaction than some unstated baseline—not that the Product has *zero* sensitizers.  Mot. at 16–19.  To support this position, Unilever points to guidance by the FDA that the term "hypoallergenic" has no federal definition and means "whatever a particular company wants it to mean."  Mot. at 15–17.[8]  Unilever primarily relies on two cases—*Rugg v. Johnson & Johnson*, No. 17-5010, 2018 WL 3023493 (N.D. Cal. June 18, 2018), and *McAteer v. Target Corp.*, No. 18-349, 2018 WL 3597675 (D. Minn. July 26, 2018)—to argue that the definition of "hypoallergenic" is not materially misleading as a matter of law.  Mot. at 17–18.

The Court is unpersuaded by either case.  In *Rugg*, a district court in California held that no reasonable consumer would understand "hypoallergenic" to mean a product contains no ingredient, in any concentration, capable of producing an allergic reaction.  2018 WL 3023493, at *3.  But Plaintiffs here did not make allegations along those lines.  Unilever hangs onto one line in Plaintiffs' Complaint, which states that "consumers seeking *hypoallergenic* products . . . expect that the product does not contain *any* skin sensitizers."  Compl. ¶ 60; Mot. at 19.  But contrary to Unilever's assertion, Plaintiffs do not merely allege that "hypoallergenic" means the product is "completely free of ingredients that can cause an allergic reaction."  Mot. at 19.  Plaintiffs' allegations about the Product are more nuanced than those in *Rugg*:

> "hypoallergenic" and "sensitive skin" communicate to reasonable consumers that the Product: (a) is not itself a skin sensitizer; (b) will not cause irritation, corrosion, or contact dermatitis when used as directed by intended users; (c) does not contain significant amounts of ingredients known to cause such reactions in intended users; and (d) does not contain sensitizers in amounts reasonably expected to induce allergic responses in significant numbers of intended users or sensitized individuals.

---

[8]  Citing Food & Drug Admin., "Hypoallergenic" Cosmetics (Feb. 25, 2022), https://www.fda.gov/cosmetics/cosmetics-labelingclaims/HYPOALLERGENIC-cosmetics  (last visited June 10, 2026).

Compl. ¶ 61.  Plaintiffs also point to comparable products, *see id.* ¶¶ 83, 105, the absence of which sank the plaintiffs in *McAteer*, 2018 WL 3597675, at *5.

Unilever's own lead authority also belies its argument that the word "hypoallergenic" is not misleading.   In *Wiggins*, the court confronted a materially identical definition of "hypoallergenic" and declined to hold it unreasonable as a matter of law.  684 F. Supp. 3d at 147– 51 ("Defendant has not demonstrated that there is one generally accepted dictionary definition of 'hypoallergenic.'").   Several courts have found a definition of "hypoallergenic" materially identical to Plaintiffs' to be plausible.  *See, e.g.*, *Timmins v. Unilever*, 785 F. Supp. 3d 774, 781– 82 (E.D. Cal. 2025); *Souter*, 2023 WL 5011747, at *3.  This Court will follow suit.  Plaintiffs' definition of "hypoallergenic" is plausible.

Unilever's definitional argument also suffers from a deeper problem.  Unilever essentially asks the Court to choose a meaning for the word "hypoallergenic."  Yet the sources Unilever relies on make that nearly impossible to do.  The dictionary, the FDA's guidance, and *Rugg* and *McAteer* each pull in different directions.  The dictionary supplies that the prefix "hypo-" means "less than" without saying less than what.  The FDA has declined to define "hypoallergenic" and lets companies decide its meaning. Mot. at 15–17.  And *Rugg* and *McAteer* read the term narrowly, in Unilever's favor, whereas *Wiggins*, *Timmins*, and *Souter* declined to do the same.  Put simply, Unilever's authorities do not coalesce around a common definition of "hypoallergenic."  That is the hallmark of an ambiguous term—not a settled one.

Ambiguity in labeling cases can arise in two ways.  The first is ambiguity of *meaning*: "[a]n ambiguous term is one that is reasonably susceptible to more than one reading, or one as to which reasonable minds could differ."  *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir. 2005).  If a word is open to competing reasonable readings, a court may not "select between

competing plausible interpretations of an ambiguous term" on a motion to dismiss. *Souter*, 2023 WL 5011747, at \*3; *Timmins*, 785 F. Supp. 3d at 781–82 ("Even if Defendant or the Court could construct a competing plausible definition, it would be improper at this stage for the Court to select between competing plausible interpretations of an ambiguous term.") (internal quotation marks and citation omitted). As discussed above, the Product's labeling is ambiguous in meaning, defeating Unilever's construction otherwise.

Under a separate line of cases, labeling could also be ambiguous if consumers would not understand the label's representations at face value. "[A product's] front label is not ambiguous simply because it is susceptible to two possible meanings; a front label is ambiguous when reasonable consumers would necessarily require more information before reasonably concluding that the label is making a particular representation." *Whiteside*, 108 F.4th at 781.

"Hypoallergenic," especially when paired with "sensitive skin," is at least ambiguous in meaning. That ambiguity is enough to defeat Unilever's argument here: because the term is reasonably susceptible to more than one reading, the Court may not adopt Unilever's narrower construction as a matter of law at the pleading stage. Ambiguity of meaning is distinct, however, from the ambiguity that governs whether a court may look past the front label to the back. The front label here makes a definite representation that the Product is suited for sensitive skin and, as hypoallergenic, will not provoke the reactions that non-hypoallergenic products may. *See* Compl. ¶¶ 61–62. The Court takes up representation ambiguity and whether the back label cures any deception below. *See infra* Section III.B.3.

       3.     *Plaintiffs plausibly plead that the Product's label is misleading*

Plaintiffs must also plausibly allege that the Product is not what the reasonable consumer expected to receive—*i.e.*, that it contains sensitizers in concentrations sufficient to provoke

24

reactions in a significant number of users. The Court first measures Plaintiffs' allegations against *Wiggins*, where similar allegations were dismissed and the case Unilever invokes most. The Court then explains how Plaintiffs' allegations about the Product's ingredients and Unilever's disclosures supply what *Wiggins* found missing. Finally, the Court considers whether laboratory testing is required at the pleading stage, the parties' cited Amazon reviews, the back label, and Unilever's causation arguments.

Rule 8 requires that a complaint provide a "short and plain statement of the claim showing that the [plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a)(2). This is a liberal standard. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002). Plaintiffs need not prove their case at this stage, only plead it. *Maniscalco v. Brother Int'l Corp.*, 627 F. Supp. 2d 494, 503 (D.N.J. 2009) ("[T]o survive a motion to dismiss, Plaintiffs are only required to put forth enough factual matter (taken as true) to suggest the elements of the claim.") (citation omitted).

The Court starts with *Wiggins*, which dismissed claims similar to those here on the very same product at issue, and on which Unilever relies throughout its Motion. In *Wiggins*, the court accepted plaintiffs' definition of "hypoallergenic" but dismissed the complaint because plaintiffs failed to "plead factual allegations demonstrating that the chemicals they cite actually cause allergic reactions . . . such that Defendant's 'hypoallergenic' . . . label[] [is] false and misleading." 684 F. Supp. 3d at 149–50.[9] The *Wiggins* plaintiffs neither alleged that the Dove products had

---

[9] *Souter* and *Timmins*—two decisions applying California law—sit in tension with *Wiggins*. In *Souter*, the Ninth Circuit reversed a district court that dismissed a "hypoallergenic" claim by constructing its own narrower reading of the term; the Court there required the plaintiff to show a comparative effect against competing products, or her own physical reaction. 2023 WL 5011747, at *2–3. In *Timmins*, a district court held that the plaintiff's "hypoallergenic" definition was plausible because it was "substantially similar to the definition" in *Souter* and the Complaint sufficiently alleged that the product contained fragrance—a common, generically-identified allergen. 785 F. Supp. 3d at 781. *Wiggins* effectively picked the narrower of two plausible readings of "hypoallergenic"—one requiring proof of concentration-driven effect—and dismissed

25

Case 2:25-cv-04804-EP-JBC   Document 53   Filed 06/30/26   Page 26 of 50 PageID: 488

caused them an allergic reaction nor offered test results or expert reports showing that the challenged ingredients, at their actual concentrations, were likely to cause reactions in a significant number of people. *Id.* at 151. Unilever argues that the Complaint here, like the complaint in *Wiggins*, rests on "barebones allegations [that] are insufficient to state a consumer deception claim." Mot. at 14.

Plaintiffs here plead the facts absent in *Wiggins* through the Product's own ingredients and Unilever's own disclosures. The Complaint identifies a recognized scientific and regulatory threshold—0.1%—above which a sensitizing ingredient is classified as a skin sensitizer. Compl. ¶¶ 56–58. Citing Unilever's own Safety Data Sheet,[10] Plaintiffs assert that the Product contains cocamidopropyl betaine at a concentration of 1 to 10%—above the skin sensitizer threshold. *Id.* ¶ 73. It is not an obscure ingredient: cocamidopropyl betaine was the American Contact Dermatitis Society's "Allergen of the Year" in 2004. *Id.* ¶¶ 73–74.

Plaintiffs also point to five other skin sensitizers in the Product. Among those are fragrance chemicals, which Plaintiffs allege are a leading cause of allergic contact dermatitis according to the American Academy of Dermatology. *Id.* ¶¶ 64–69. The Complaint also alleges that several of the Product's other ingredients—citric acid, glycerin, and sodium benzoate—are recognized or classified as skin sensitizers shown to cause allergic reactions on contact. *Id.* ¶¶ 76–77, 79. And several of those same ingredients are classified as skin and eye irritants. *Id.* Those facts alone

---

because the complaint did not satisfy it. 684 F. Supp. 3d at 151–52. Unlike *Wiggins*, *Souter* and *Timmins* refused to pick a plausible reading at the motion to dismiss stage.

[10] A Safety Data Sheet is a standardized disclosure a manufacturer must prepare under OSHA's Hazard Communication Standard, 29 C.F.R. § 1910.1200(g), identifying a product's chemical makeup and its known hazards.

cure *Wiggins*'s failure to plead "chemicals [that] actually cause allergic reactions."  684 F. Supp. 3d at 150.

            a.        Plaintiffs need not conduct laboratory testing to plausibly state their claims

Unilever's answer is that Plaintiffs ran no laboratory testing on the Product to establish that its skin sensitizers are present in concentrations that actually cause allergic reactions.  Mot. at 6–8; Reply at 4.  Unilever relies on *Wiggins* to argue that "[r]equiring a laboratory analysis is the norm in cases like this."  Mot. at 6.  Indeed, although Plaintiffs allude to testing that supports that the Skin Sensitizers cause allergic reactions, they do not in fact cite any actual tests.  *See* Compl. Plaintiffs counter that requiring laboratory testing of the Product "exceeds Rule 8's liberal requirements."  Opp'n at 6–7.  The Court agrees with Plaintiffs.

*Wiggins* itself rejected the laboratory test requirement:  "The Court does not mean to suggest that a consumer-protection plaintiff will only be able to state a claim if he can retain an expert to conduct sophisticated chemical analysis before bringing suit."  684 F. Supp. 3d at 149–52.  Plaintiffs there lost for reasons other than the lack of a laboratory report.  *See id.*

More broadly, at the pleading stage, Plaintiffs need not allege "specific details" about the Skin Sensitizers that would appear in a laboratory report.  *See Williams v. Samsung Elecs. Am., Inc.*, No. 23-989, 2024 WL 1328133, at *7 (D.N.J. Mar. 28, 2024) (holding that at the pleading stage plaintiff need not identify the component that caused a mechanical defect).  "[P]re discovery, the lack of [such details about the Skin Sensitizers] is unsurprising, and not fatal."  *Id.* (internal quotation marks and citation omitted).  Rule 8 requires only that Plaintiffs identify "the part" of the Product that misleads consumers and "examples of how" consumers are misled.  *Rains*, 2023 WL 6234411, at *6.  Plaintiffs do that here.  *See, e.g.*, Compl. ¶¶ 37–38, 44–48, 53–57.

27

Unilever's string of testing cases is not on point.  Each involved an organic or natural product whose composition varied product to product, so that a test of one sample proved nothing about another.[11]  The Product—a mass-produced, fixed-formula body wash—does not vary in that way.  The Court declines to require Plaintiffs to submit laboratory testing at this stage.

b.        The Amazon reviews

The Complaint backs its claims with Amazon consumer reviews reporting reactions, *id.* ¶ 70, and corroborating Plaintiffs and their families' experiences, *id.* ¶¶ 13, 19, 24, 30.  Both parties cite Amazon reviews.  *See* Compl. ¶ 70; Reply at 2–4.  The Court considers the consumer reviews not for their truth or as evidence of how the public understands the term "hypoallergenic."  The reviews, however, do corroborate plausibility at the pleading stage.  *Compare Energizer Brands, LLC v. My Battery Supplier, LLC*, 529 F. Supp. 3d 57, 64 (E.D.N.Y. 2021) (considering pleaded consumer reviews to show "that at least some consumers were confused or dissatisfied" with the product and collecting cases doing the same), *with Donnenfeld v. Petro Home Servs.*, No. 16-882, 2017 WL 1250992, at *5 (D.N.J. Mar. 24, 2017) (refusing to consider pleaded consumer reviews as "substantive evidence of Defendant's wrongdoing").  Indeed, *Wiggins* noted that a complaint could survive by pleading that "toxic ingredients are present in sufficient concentration to cause harm," backed by "reporting [plaintiff's] own experiences" or citing "reviews of the Products on the Internet."  684 F. Supp. 3d at 150–51.

---

[11] Unilever's cases are distinguishable on other grounds too.  *In re Whole Foods Mkt., Inc.* was dismissed on federal preemption grounds, not for failure to test. 163 F. Supp. 3d 385, 392–93 (W.D. Tex. 2016). *Pels v. Keurig Dr. Pepper, Inc.* was dismissed for lack of standing, because the plaintiff could not allege that the bottle he purchased came from the same contaminated source as the units that had tested positive for arsenic. No. 19-3052, 2019 WL 5813422, at *4–5 (N.D. Cal. Nov. 7, 2019).  *Fahey v. Deoleo USA, Inc.*, No. 18-2047, 2018 WL 5840664, at *2–3 (D.D.C. Nov. 8, 2018), and *Gaminde v. Lang Pharma Nutrition, Inc.*, No. 18-300, 2019 WL 1338724, at *1–3 (N.D.N.Y. Mar. 25, 2019), both rested on an outdated, batch-specific third-party study that could not plausibly speak to the particular bottle the plaintiff bought.

For its part, Unilever's Reply attaches a select compilation of the 39,349 Product ratings, 87% of which give the product five stars, and argues that a product that most buyers love cannot be deceptive. Reply at 2–4. On a motion to dismiss, the Court cannot consider Unilever's consumer reviews because it is confined to the Complaint, documents integral to it, and matters of judicial notice. *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

Yet even at face value, Unilever's positive reviews prove little. That most buyers are satisfied does not establish, as a matter of law, that the label does not mislead people with sensitive skin—the actual consumers whom the "significant portion of . . . *targeted* consumers" standard exists to protect. *Whiteside,* 108 F.4th at 778. Consumer fraud could still be plausible despite high product satisfaction. *See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 591–94 (3d Cir. 2002) (discussing that survey evidence showing only 15% of respondents were misled sufficed to establish deception of a "substantial portion" of the intended audience, and noting that courts have found surveys with "7.5% consumer deception" to be adequate).

c.      The back label does not cure the front's alleged misrepresentation

Unilever contends that any deception on the front of the Product is cured by the ingredient list on the back, which discloses the Skin Sensitizers. Mot. at 17–19; Reply at 5–6. Under California law, a court may look at the back label only "when reasonable consumers would necessarily require more information before reasonably concluding that the label is making a particular representation." *Whiteside*, 108 F.4th at 780–81. Reasonable consumers "should not be expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print" on the back. *Williams v. Gerber Prods. Co.*, 552 F.3d 934,

29

939–40 (9th Cir. 2008). Consumers expect the back label to confirm the front's representations—not to correct it. *Id.*

Here, "reasonable consumers would not require more information before reasonably concluding that the front label [of the Product] was making a specific representation." *Timmins*, 785 F. Supp. 3d at 782 (declining to reach the back label because the "hypoallergenic" front label did not require more information to convey its representation); *see Timmins v. Walmart*, 790 F. Supp. 3d 931, 936–37 (E.D. Cal. 2025) ("*Timmins II*") (same). The ambiguity in the Product's label is not of the kind in *Whiteside* where a court consults the back label. *See Whiteside*, 108 F.4th at 780.

New York law dictates the same outcome. "In determining whether a reasonable consumer would have been misled by a particular advertisement, context is crucial." *Mantikas*, 910 F.3d at 636 (citation omitted). Courts "consider the challenged [label] as a whole." *Id.* As in California, reasonable consumers in New York "expect that the ingredient list" confirms "representations on the front of the box." *Mantikas*, 910 F.3d at 637 (citing *Gerber*, 552 F.3d at 939–40). In other words, a back label disclosure that *clarifies* ambiguity can cure a misleading front label. *See id.* For instance, the Second Circuit in *Mantikas* held that a "whole grain" front label was not cured by an ingredient panel showing enriched white flour (not whole grain). *Id.* Applying that logic here, the Product's "hypoallergenic" front label (on Plaintiffs' reading of the terms) would not be cured or clarified by a back ingredient panel showing ingredients that are skin sensitizers. And importantly, requiring a consumer to know the "properties, origins, and effects on the skin" of each listed ingredient in the Product's back label is "plainly untenable." *Anderson v. Unilever U.S., Inc.*, 607 F. Supp. 3d 441, 454 (S.D.N.Y. 2022) (rejecting defendant's argument that potential

30

ambiguity in the term "microbiome gentle" on the product's front label would be cured by the "long list of ingredients, most of which are referred to by a scientific name" on the back label).

New Jersey law reaches the same result. This District has not extensively addressed the front/back-label-ambiguity question. Courts in this District have, however, considered "whether a consumer would tend to overlook" additional information beyond the alleged misrepresentation. *Johnson v. Shop-Vac Corp.*, No. 19-1483, 2020 WL 3496957, at *5 (D.N.J. June 29, 2020) (citations omitted). In *Shop-Vac*, for instance, the court held that a "footnote or disclaimer will not salvage an otherwise misleading representation if the footnote or disclaimer is so inconspicuously located or in such fine print that readers tend to overlook it." *Id.*

The Court applies that logic here. Unilever contends that the back label ingredients cure any alleged front label deception. *See* Mot. at 17–19. But a reasonable consumer would not know or understand the chemical ingredients in the Product's back label. *See Anderson*, 607 F. Supp. 3d at 454. An inability to understand a product's back label is the functional equivalent of overlooking it. So the Product's chemical-disclosing back label, *see* Compl. ¶¶ 72–73, fails to cure Plaintiffs' properly alleged front label deception.

In short, Plaintiffs plausibly allege that the ingredient list on the back label "contradicts, rather than confirms, Defendant's representations on the front." *Mantikas*, 910 F.3d at 637 (citation modified). Despite there not being a single definition of what it means to be hypoallergenic, *see supra* Section III.B.2, the Product's front label is not ambiguous under *Whiteside* and *Mantikas*.

> d.    <u>Physical causation is not an element of an economic injury or a consumer protection claim</u>

Unilever devotes much of its briefing to arguing that Plaintiffs do not allege the Product caused Plaintiffs' allergic reactions. Mot. at 13–14; Reply at 2–4. That argument improperly

31

conflates three distinct issues: (1) reliance; (2) deception; and (3) physical causation. Only the first two bear on Plaintiffs' claims.

Plaintiffs allege they relied on the Product's representation when purchasing the Product, which caused Plaintiffs a price-premium economic injury. The Product's label as "hypoallergenic" misled and therefore deceived Plaintiffs. Reliance and deception go to Plaintiffs' economic injury. Physical causation or harm by the Product, however, do not bear on that injury. Plaintiffs claim a price premium economic injury (discussed *supra* Section III.A.2), which means their alleged injury is *not* physical—it is economic. The injury was complete once Plaintiffs paid for a Product they allegedly could not use. Compl. ¶¶ 104, 129. That Plaintiffs' symptoms "may have" come from the Product, *id.* ¶¶ 14–19, 25–30, is a question separate from economic injury, *Souter v. Edgewell Pers. Care Co.*, 542 F. Supp. 3d 1083, 1091–92 (S.D. Cal. 2021) (denying motion to dismiss in consumer fraud case when Plaintiff established economic harm that was "cognizable [and] independent of whether the product caused [Plaintiff] actual harm.").

Unilever reads *Wiggins* to require that plaintiffs allege, with more certainty than "may have," that the Product caused their allergic reactions. Reply at 2–4. That is a misreading of *Wiggins*. The court in *Wiggins* dismissed the complaint because plaintiffs failed to plead facts showing that skin sensitizers were present "in an amount that is known to cause" or that the chemicals "actually cause" allergic reactions in "significant numbers of people." 684 F. Supp. 3d at 151. *Wiggins* noted that plaintiffs there had "not alleged that the Dove products have caused them . . . to suffer," but never held that direct causation was a pleading requirement. *See id.* The plausibility of an allergic reaction in a significant portion of reasonable consumers is all that *Wiggins* required. Plaintiffs meet that requirement.

32

* * *

The Court finds that Plaintiffs plausibly plead that the Product is not "hypoallergenic" as labeled. Whether the Product's "labels would mislead a reasonable consumer is a question of fact for the jury." *Segedie v. Hain Celestial Grp., Inc.*, No. 14-5029, 2015 WL 2168374, at \*12 (S.D.N.Y. May 7, 2015). The Complaint's allegations pass the "significant portion" test of the NYGBL and CA Consumer Laws. So they also pass the NJCFA's less-stringent "capacity to mislead" test.

### C. Plaintiffs' NJCFA Claim Survives on an Affirmative Misrepresentation but Not an Omission Theory (Count Six)

To state an NJCFA claim, a plaintiff must allege three elements: (1) an unlawful act by the defendant; (2) an ascertainable loss on the part of the plaintiff; and (3) a causal relationship between the defendant's unlawful conduct and the plaintiff's ascertainable loss. *McCalley v. Samsung Elecs. Am., Inc.*, No. 07-2141, 2008 WL 878402, at \*7 (D.N.J. Mar. 31, 2008). A plaintiff "must allege facts that establish that the alleged fraudulent conduct induced or lured the plaintiff into purchasing merchandise[.]" *Joe Hand Promotions, Inc. v. Mills*, 567 F. Supp. 2d 719, 724 (D.N.J. 2008); *see Scalercio-Isenberg v. Select Portfolio Servicing, Inc.*, No. 20-4501, 2021 WL 268155, at \*2 (D.N.J. Jan. 27, 2021) ("The NJCFA only covers unlawful conduct 'in connection with the sale or advertisement of any merchandise or real estate.'" (quoting N.J. Stat. Ann. § 56:8-2)). Because the NJCFA claim sounds in fraud, Rule 9(b)'s particularity applies. *Crozier v. Johnson & Johnson Consumer Cos.*, 901 F. Supp. 2d 494, 506 (D.N.J. 2012).

The third element—causation—is satisfied. Plaintiffs allege they saw the representations on the Product, relied on them, and bought the Product because of them. Compl. ¶¶ 10–12, 21–23. Plaintiffs need not plead reliance in the common-law sense; it is enough that the misrepresentation induced the purchase. *See Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 607–

33

08 (1997). Further, the causal nexus is satisfied where, as here, the Complaint alleges that "had the alleged [misrepresentation] been disclosed, consumers would not have purchased the product." *Zabransky v. Samsung Elecs. Am., Inc.*, No. 24-2133, 2025 WL 943091, at *9 (D.N.J. Mar. 28, 2025) (citation omitted); *see* Compl. ¶¶ 21–23. Accordingly, the Court focuses on the remaining two elements: unlawful acts and ascertainable loss.

The NJCFA recognizes three types of unlawful acts: (1) affirmative misrepresentations; (2) knowing omissions; and (3) regulation violations. *Mladenov v. Wegmans Food Markets, Inc.*, 124 F. Supp. 3d 360, 373 (D.N.J. 2015). Plaintiffs assert the first two, that Unilever (1) affirmatively misrepresented that the product is "hypoallergenic" and suitable for "sensitive skin," and (2) knowingly omitted that the product contains the Skin Sensitizers that make those representations false. Compl. ¶¶ 91–94, 106–07. As explained below, the Court finds Plaintiffs sufficiently stated an NJCFA claim rooted in an affirmative misrepresentation theory, but not under its omission theory. Plaintiffs also properly plead an ascertainable loss.

### 1. Affirmative misrepresentation

Under the NJCFA, "[a]ffirmative acts must be 'misleading and stand outside the norm of reasonable business practice in that it will victimize the average consumer.'" *Harnish v. Widener Univ. Sch. of L.*, 931 F. Supp. 2d 641, 648 (D.N.J. 2013) (quoting *N.J. Citizen Action v. Schering-Plough Corp.*, 367 N.J. Super. 8, 13 (App. Div. 2003)). An affirmative misrepresentation is "one which is material to the transaction and which is a statement of fact, found to be false." *Gennari*, 148 N.J. 582, 607 (1997). Liability attaches "even in the absence of knowledge of the falsity of the misrepresentation, negligence or the intent to deceive." *Id.* at 605.

The "prime ingredient" of an NJCFA claim is the "capacity to mislead." *Cox*, 138 N.J. at 17–18. The Court has already held that "hypoallergenic," paired with "sensitive skin," has the

34

capacity to mislead a reasonable consumer. *See supra* Section III.B.  A statement that could mislead a significant portion of reasonable consumers has the capacity to mislead. *Id.*

Plaintiffs' claims also comply with Rule 9(b)'s heightened pleading standard.  Although fraud allegations "must go well beyond Rule 8's threshold of plausibility," *United States ex rel. Bookwalter v. UPMC*, 946 F.3d 162, 176 (3d Cir. 2019), Rule 9(b) does not require "every material detail of the fraud, such as date, location, and time," *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002).  Indeed, "intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

Rule 9(b) requires a plaintiff to allege "all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where, and how of the events at issue." *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) (citation omitted).  Here, Plaintiffs plead all these necessary details:

- Who:  Unilever—the entity responsible for the Product's label, formulation, and marketing.  Compl. ¶ 92.

- What:  The front-label claims that the Product is "hypoallergenic" and made for "sensitive skin" despite containing the Skin Sensitizers. *Id.* ¶¶ 92, 106.

- When:  Rosenfeld purchased the Product four or five times between 2020 and 2025; Novick purchased the Product at least ten times between 2023 and 2025. *Id.* ¶¶ 11, 22.

- Where:  On the Product's front label and at the register in CVS and Duane Reade in Brooklyn, CVS and Walmart in Toms River, and CVS, Target, and Walmart in Van Nuys and West Hills. *Id.*

35

- How:  By representing through a uniform front label that appears on the Product that it is "hypoallergenic" and for "sensitive skin" despite the Skin Sensitizers it contains.  *Id.* ¶¶ 91–92, 106.

*See also* Opp'n at 16–17 (bolstering each of these points).  Plaintiffs properly plead an affirmative misrepresentation that has the capacity to mislead.  Therefore, the Court will **DENY** Unilever's Motion as to Count Six's affirmative misrepresentation theory.

    2.    *Omission*

Unlike its counterpart, an omission theory under the NJCFA requires knowledge, which Plaintiffs fail to plausibly allege.  "To establish an act of omission under the NJCFA, 'plaintiff must show that defendant (1) knowingly concealed (2) a material fact (3) with the intention that plaintiff rely upon the concealment.'"  *Harnish*, 931 F. Supp. 2d at 652 (quoting *Judge v. Blackfin Yacht Corp.*, 357 N.J. Super. 418, 425 (App. Div. 2003)).  Under the NJCFA, "when the alleged consumer fraud consists of an omission, the plaintiff must show that the defendant acted with knowledge, and intent is an essential element of the fraud."  *Kalow & Springnut, LLP v. Commence Corp.*, No. 07-3442, 2009 WL 44748, at *3 (D.N.J. Jan. 6, 2009) (quoting *Cox*, 138 N.J. at 18).

While the heightened pleading standard of Rule 9(b) allows essential elements of the omission under the NJCFA (such as intent) to be alleged generally, such elements still need to be plausibly alleged.  *Id.*  The Complaint alleges that Unilever "conceal[s] and suppresses" the "true nature of the Product's ingredients," that the product contains the Skin Sensitizers, and that the Product is not what a reasonable consumer would consider hypoallergenic.  *See* Compl. ¶¶ 92, 94, 107.

Plaintiffs offer three sources of Unilever's knowledge: (1) Unilever's website; (2) the Product's Safety Data Sheet; and (3) negative reviews posted to the "Dove store" on Amazon.

36

Opp'n at 18; *see* Compl. ¶¶ 55, 70, 73. *First*, Plaintiffs point to Unilever's website, which acknowledges that "a selection of ingredients used in fragrances have the potential to cause skin allergies in some individuals." Compl. ¶ 55. The second part of that statement, however, explains that Unilever discloses its fragrance ingredients "for transparency and to help you make informed choices." Reply at 7–8. That statement is candor, not knowledge of falsity or concealment. Treating Unilever's openness as proof that it knew or hid something would punish disclosure and reward silence, and it is exactly the kind of alleged omission that "evidence[s] no such mental state." *L.L. Cap. Partners, L.P. v. Rockefeller Ctr. Props., Inc.*, 939 F. Supp. 294, 299 (S.D.N.Y. 1996). Unilever argues that point in its briefing, Mot. at 27–28, and the Court agrees.

*Second*, Plaintiffs point to the Safety Data Sheet's statement that the Product contains cocamidopropyl betaine at 1 to 10%. Compl. ¶ 73. But stating the Product's chemical concentration is not knowledge of its alleged falsity. *See Simner v. LG Elecs. U.S.A., Inc.*, No. 21-13322, 2022 WL 3152707, at *13 (D.N.J. Aug. 8, 2022) (finding that pleading a defendant's knowledge of a product characteristic is not enough to allege knowledge of the label's falsity). A manufacturer that reasonably reads "hypoallergenic" to mean "less" would not knowingly conceal the alleged misrepresentation by selling the product. In short, the Safety Data Sheet establishes that Unilever knew what chemicals the Product contains—not that it knew the label was false.

*Third*, Plaintiffs cite negative reviews posted to the "Dove store" on Amazon. Opp'n at 17. Plaintiffs contend that because Unilever operates and monitors that storefront, it must have seen those negative reviews. *Id.* The Complaint quotes the reviews, Compl. ¶ 70, but never alleges that Unilever operates the Dove store, monitors Amazon, or receives notice of those reviews, *see id.* The theory debuts in the Opposition, and the Complaint "may not be amended by the briefs." *Zimmerman*, 836 F.2d at 181.

37

Cases in this District have reached the same result on similar facts.  Internet postings, standing alone, do not impute knowledge to the manufacturer without facts indicating that the manufacturer "viewed or would have viewed those websites" or "monitored third-party website complaints."  *Zabransky*, 2025 WL 943091, at *7.  Postings paired with pleaded monitoring or reporting lines, however, can support an inference of knowledge.  *See George v. Jaguar Land Rover N. Am., LLC*, No. 20-17561, 2021 WL 5195788, at *11 (D.N.J. Nov. 8, 2021) (finding pre-sale knowledge adequately pleaded where plaintiff alleged manufacturer "monitored online consumer forums as part of its online reputation management efforts").  The NJCFA omission theory requires knowledge that the Product's label was false.  Plaintiffs fail to plausibly plead such knowledge.  For that reason, it fails.  Therefore, the Court will **GRANT** Unilever's Motion as to Count Six's omission theory.

### 3. Ascertainable loss

Plaintiffs plausibly plead an ascertainable loss in the form of a price premium.  *See supra* Section III.A.2.  Unilever ardently argues that the Complaint never quantifies a loss or ties it to the NJCFA claim, and that paying a "premium" is a legal conclusion dressed up as a fact.  Mot. at 23–25.  It collects various decisions dismissing price premium theories where plaintiff had not pleaded any benchmark.[12]  Plaintiffs respond that the NJCFA is liberally construed and that no specificity for pleading ascertainable loss is required.  Opp'n at 19–22.  Plaintiffs assert they have pleaded a measurable premium by alleging the price they paid and identifying cheaper comparators against which differences can be calculated.  *Id.*  Plaintiffs note that "[n]o special specificity with regard

---

[12] *See, e.g.*, *Borenkoff*, 2018 WL 502680, at *3 (dismissing price premium claim where plaintiff failed to allege how the substituted ingredient "affect[ed] the objective economic value of the" items she received); *Ponzio*, 447 F. Supp. 3d at 242–44 (same).

to pleading ascertainable loss is required." *Id.* at 19 (citing *Zabransky*, 2025 WL 943091, at *8–9).  The Court agrees with Plaintiffs.

A price premium is a recognized form of ascertainable loss under the NJCFA.  *See In re Riddell Concussion Reduction Litig.*, 121 F. Supp. 3d 402 (D.N.J. 2015) (finding Plaintiffs "sufficiently plead[ed an] ascertainable loss and injury under the NJCFA" using a price premium theory); *Smajlaj*, 782 F. Supp. 2d at 103 (holding that the ascertainable loss was the "difference in retail price between what they paid for (less-sodium soup) and what they got (soup equivalent)").

Plaintiffs also allege a second form of ascertainable loss:  "out-of-pocket" loss, which "applies where plaintiffs allege that the defendant's misconduct caused them to purchase a worthless product or required them to spend additional money, such as the cost of repairing a defective product."  *Gumba v. LeafFilter N. of New Jersey, LLC*, No. 23-1979, 2024 WL 378698, at *3 (D.N.J. Feb. 1, 2024) (citation omitted).  Plaintiffs explicitly allege that they could not use the Product, Compl. ¶¶ 104, 129, and that the Product's "value plummets to $0 if its intended users cannot use it without risking allergic reactions," Opp'n at 24.

### D.  Plaintiffs' NYGBL Claims Survive (Counts Four and Five)[13]

NYGBL §§ 349 and 350 respectively prohibit deceptive acts and false advertising.  Claims brought under either statute are not subject to the heightened particularity requirements of Rule 9(b).  *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005).

To state a claim under either Section 349 or 350, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice."  *Wynn v. Topco Assocs., LLC*, No. 19-11104, 2021 WL 168541, at *2 (S.D.N.Y. Jan. 19, 2021) (quoting *Orlander*

---

[13] As noted above, Counts Four and Five are only brought by Rosenfeld.

*v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015)) (internal quotation marks omitted). A claim under the NYGBL must "do more than plausibly allege that a label might conceivably be misunderstood by some few consumers." *Campbell v. Whole Foods Mkt. Grp., Inc.*, 516 F. Supp. 3d 370, 381 (S.D.N.Y. 2021).

In fact, a plaintiff "must plausibly allege that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Id.* And "[a]lthough the question of whether a business practice or advertisement is misleading to the reasonable consumer is generally a question of fact, it is well settled that a court may determine as a matter of law that an allegedly deceptive advertisement would not have misled a reasonable consumer." *Twohig v. Shop-Rite Supermarkets, Inc.*, 519 F. Supp. 3d 154, 160 (S.D.N.Y. 2021) (internal quotation marks and citation omitted).

### 1.    Deceptive act or practice under Section 349 (Count Four)

Rosenfeld has established all three elements. The Court has already resolved two of them: the materially misleading element (*see supra* Section III.B) and the injury element under a price-premium economic theory (*see supra* Section III.A.2). As Unilever appears to concede, *see* Mot., labeling a nationally marketed consumer product is, by nature, consumer-oriented conduct. *Anderson*, 607 F. Supp. 3d at 451 (finding Unilever's national distribution of a Dove body wash to be consumer-oriented conduct).

Contrary to Unilever's position, Mot. at 23–25, Plaintiffs' price premium theory survives under New York law. "One method of demonstrating actual injury in the consumable goods context is by showing that the plaintiff paid a 'price premium'—that is, as a result of the defendant's deception, the plaintiff paid more for a product than he otherwise would have." *Eidelman v. Sun Prods. Corp.*, No. 21-1046, 2022 WL 1929250, at *1 (2d Cir. June 6, 2022).

40

"Demonstrating a price premium is but one recognized method of establishing injury." *Id.* Therefore, the Court will **DENY** Unilever's Motion as to Count Four.

### 2. *False advertising under Section 350 (Count Five)*

The false advertising claim survives for the same reasons. Section 350 prohibits advertising that is "misleading in a material respect," N.Y. Gen. Bus. Law § 350-a(1), and consists of the same three-element test as Section 349, *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941 (2012). Because Plaintiffs plausibly plead a claim under Section 349, they do so under Section 350. *See Klausner v. Annie's, Inc.*, 581 F. Supp. 3d 538 (S.D.N.Y. 2022) ("The standard for recovery under § 350, while specific to false advertising, is otherwise identical to § 349, and therefore the Court will merge its analysis of the two claims." (citation modified)). Accordingly, the Court will **DENY** Unilever's Motion as to Count Five.

### E. Plaintiffs' UCL and FAL Claims Fail and CLRA Claim Survives (Counts One, Two, and Three)

Plaintiff Novick's three CA Consumer Law claims apply the reasonable consumer standard. The CA Consumer Laws ask whether "members of the public are likely to be deceived." *Serrano*, 773 F. Supp. 3d at 140 (quoting *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016)). The CA Consumer Laws also require Rule 9(b)'s heightened pleading standard of "who, what, when, where, and how the misconduct was charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 964 (9th Cir. 2018).

However, they diverge on remedy. The divergence between the three causes of action specifically turns on the adequate-remedy bar. A federal plaintiff who seeks equitable relief must plead that they lack an adequate remedy at law. *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020). The UCL and FAL claims fail because Plaintiffs have not pleaded that they

lack an adequate remedy at law.  The CLRA claim survives because it seeks damages, which the adequate-remedy bar does not reach.

### 1.    Plaintiffs' UCL and FAL Claims Fail (Counts One and Two)

*Sonner* requires a federal plaintiff seeking equitable relief to plead that they lack an adequate legal remedy.  971 F.3d at 844.  Unilever argues that after *Sonner*, Plaintiffs must plead that equitable remedies would be inadequate, and that seeking damages on the same facts ordinarily concedes that an equitable remedy exists.  Mot. at 25–26 (citing *Anderson v. Apple Inc.*, 500 F. Supp. 3d 993, 1009–10 (N.D. Cal. 2020); *Watson v. Crumbl LLC*, 736 F. Supp. 3d 827, 840 (E.D. Cal. 2024)).  Plaintiffs counter that *Rains*, 2023 WL 6234411, at *8, recognized that *Sonner* does not categorically bar pleading legal and equitable relief together, and that the Complaint pleads several reasons its non-equitable remedies are adequate, Opp'n at 24–26 (citing Compl. ¶¶ 153–55).

The Court agrees with Unilever.  Courts in this District and across federal courts in California have found that "nothing in *Sonner* precludes plaintiffs from [pleading equitable relief] in the alternative to remedies at law." *Cepelak v. HP Inc.*, No. 20-2450, 2021 WL 5298022, at *2 (N.D. Cal. Nov. 15, 2021); *see also Hickman v. Subaru of Am., Inc.*, No. 21-2100, 2022 WL 11021043, at *11 (D.N.J. Oct. 19, 2022) ("The issue [in *Sonner*] is not whether a pleading may seek distinct forms of relief in the alternative, but rather whether a prayer for equitable relief states a claim if the pleading does not demonstrate the inadequacy of a legal remedy." (citing *Sharma v. Volkswagen AG*, 524 F. Supp. 3d 891, 907 (N.D. Cal. 2021))); *Rieger v. Volkswagen Grp. of Am., Inc.*, No. 21-10546, 2023 WL 3271116, at *7 (D.N.J. May 4, 2023) (applying *Sonner* to dismiss "arguments seeking to preserve equitable relief under the" UCL and CLRA).  Plaintiffs must still

"satisf[y] the requirement of alleging the inadequacy of legal remedies." *Rieger*, 2023 WL 3271116, at *8.

Plaintiffs cannot rely on *Rains*. There, this Court dismissed the UCL claim because the plaintiff had "not adequately pleaded that they lack an adequate legal remedy." *Rains*, 2023 WL 6234411, at *8. And although courts in this District generally find "that it is premature to dismiss a claim for relief at the pleading stage[,]" courts have rejected applying this general rule in the "narrow context" of UCL claims. *Id.* at *7 (internal quotation marks omitted). Applied here, Plaintiffs' conditional, hypothetical formulation—they "may" lack a remedy under unspecified hypothetical future circumstances—is insufficient to plead that they lack an adequate legal remedy. *See Kimball v. Volkswagen Grp. of Am., Inc.*, No. 22-4163, 2024 WL 4038171, at *4 (D.N.J. Sept. 3, 2024) (dismissing UCL claim where plaintiff failed to plead the inadequacy of a legal remedy)*; Roffman v. Rebbl, Inc.*, 653 F. Supp. 3d 723, 731 (N.D. Cal. 2023) (dismissing UCL claim where "allegations about the inadequacy of legal remedies [were] conditional"). And critically, Plaintiffs withdrew their claims for injunctive and declaratory relief. D.E. 14 at 1 n.1. The Court will **DISMISS** Counts One and Two ***without prejudice***.

### 2.      *Plaintiffs' CLRA claim survives (Count Three)*

The CLRA forbids representing that goods have characteristics or qualities they do not and authorizes actual damages. Cal. Civ. Code §§ 1770(a)(5), (7); 1780(a). Novick properly pleads the who, what, when, where, and how Rule 9(b) requires for a CLRA claim. *See supra* Section III.C.1. Indeed, the *Timmins* court found pleadings materially identical to Plaintiffs' here to be sufficient under Rule 9(b) for a CLRA claim. *Timmins*, 785 F. Supp. 3d at 779–80.

Unilever reads *Sonner* more broadly, citing *Watson*, 736 F. Supp. 3d at 840, to argue that "Courts have similarly applied Sonner to dismiss CLRA and FAL claims." Mot. at 25–26. But

*Watson* dismissed a request for equitable relief where the plaintiff pleaded *no* inadequacy.  736 F. Supp. 3d at 840 (emphasis added).  *Watson* did not hold that a CLRA claim for damages must clear the *Sonner* bar.

Indeed, the *Sonner* bar that dismissed the UCL and FAL claims does not apply to the CLRA.  *Sonner* limits a federal court's equitable power and requires a plaintiff who seeks equitable relief to plead that she lacks an adequate remedy at law.  971 F.3d at 844.  The CLRA, however, allows plaintiffs to seek damages as a legal remedy—not just equitable relief.  Cal. Civ. Code § 1780(a).  Thus, the adequate remedy requirement that is fatal to Plaintiffs' UCL and FAL claims does not reach their CLRA claim.  The Court will **DENY** Unilever's Motion as to Count Three.

### F.        Plaintiffs' Breach of Implied Warranty Claim Survives (Count Seven)

The implied warranty claim survives in California and New Jersey.[14]  The implied warranty of merchantability guarantees that goods are fit for the ordinary purpose for which they are used.  N.J. Stat. Ann. § 12A:2-314; Cal. Com. Code § 2314; *Montich v. Miele USA, Inc.*, 849 F. Supp. 2d 439 (D.N.J. 2012) ("California Uniform Commercial Code § 2314 is a near verbatim copy of N.J. Stat. Ann. § 12A:2–314 and both mirror UCC § 2–314.").  In other words, "[m]erchantability requires that a product be fit for its ordinary and intended use." *Zabransky*, 2025 WL 943091, at *13 (citation omitted).  The implied warranty "protects buyers from loss where the goods purchased are below commercial standards or are unfit for the buyer's purpose." *Rains*, 2023 WL 6234411, at *13 (citation omitted).  "The implied warranty of merchantability does not impose a general requirement that goods precisely fulfill the expectation of the buyer.  Instead, it provides for a minimum level of quality." *Lieberson v. Johnson & Johnson Consumer Cos.*, 865 F. Supp.

---

[14] Plaintiff Rosenfeld withdrew the New York implied warranty claim.  *See* D.E. 14 at 3 n.2; Mot. at 31 n.2.

2d 529, 542 (D.N.J. 2011) (citation omitted); *Am. Suzuki Motor Corp. v. Superior Court*, 37 Cal.

App. 4th 1291, 1296 (1995) (citation omitted).

Unilever argues that the Product's purpose is to clean—which it does—and that labeling

grievances do not affect the Product's function.[15]  Mot. at 31–33.  Unilever notes that "Plaintiffs

have not alleged that the Body Wash was defective or that it failed to clean their skin."  *Id.* at 32.

Unilever leverages *Crozier,* 901 F. Supp. 2d at 509, to argue that Plaintiffs must make a showing

about the Product's functionality—not just the advertisement that induced the Product's purchase.

Mot. at 33.

Plaintiffs respond that the "'ordinary purpose' of a product is one that is central to the

product's value or function."  Opp'n at 35 (citing *Dzielak v. Whirlpool Corp.*, 26 F. Supp. 3d 304,

329 (D.N.J. 2014)).  According to Plaintiffs, the Product is unfit for ordinary use because it cannot

be used for the "purpose of being a body wash suitable for sensitive skin" due to the Skin

Sensitizers in the Product's ingredients.  *Id.* at 36.

The question is not whether the Product can clean but whether it is fit for the ordinary

purpose for which *this* Product is sold.  For a body wash marketed and priced as "hypoallergenic"

and made for "sensitive skin," suitability for sensitive skin is the precise quality that defines the

Product and for which Plaintiffs allege they paid a premium.  *See* Compl. ¶ 129.  That aligns with

the Energy Star washers in *Dzielak*, where efficiency was "central to the value" of the appliance,

and set the product apart from the merely incidental product qualities that do not implicate

---

[15] Here again, Unilever wrongly conflates causation as a requirement.  "Plaintiffs have not alleged that the amount of allergens or skin sensitizers in the Body Wash caused them to develop any skin disease or other condition."  Mot. at 32–33.  But an implied warranty claim need not prove that the Product caused a disease.  *See Bocchinfuso v. Wonderful Co. LLC*, No. 24-8005, 2025 WL 2103981, at *8–9 (D.N.J. July 25, 2025) (allowing implied warranty claim to proceed where plaintiffs asserted "deficiencies in the Product itself and the economic injury of purchasing the product," not harm caused by the product).

merchantability.  *See Dzielak*, 26 F. Supp. 3d at 329.  As Plaintiffs put it, "because a car can be driven does not mean it is merchantable."  Opp'n at 36 (citing *Matanky v. Gen. Motors LLC*, 370 F. Supp. 3d 772, 785 (E.D. Mich. 2019)).

Unilever's reliance on *Crozier* therefore misses the mark.  *Crozier* held that merchantability "requires a showing regarding the product's functionality, not the advertisements that allegedly induced a customer to purchase it."  901 F. Supp. 2d at 509.  But Plaintiffs allege more than unlawful advertising.  The Court has already found that Plaintiffs plausibly allege the Product contains the Skin Sensitizers that make it unsuitable for use on sensitive skin.  *See supra* Section III.B.3.a.  That is an alleged defect in the Product's *formulation*, not its label, and a formulation defect is the kind of design defect that renders a good unfit for its ordinary purpose. *See Dzielak*, 26 F. Supp. 3d at 329.  The plaintiffs in *Crozier* alleged only that a product was mislabeled and pleaded no defect in what the product was or did; Plaintiffs here plead both.  901 F. Supp. 2d at 509.  A product marketed as "safe, effective, and fast-acting" that is alleged to be ineffective for the very symptoms it is sold to treat may breach the implied warranty even absent proof that it harmed the plaintiff.  *See Forcellati v. Hyland's, Inc.*, 876 F. Supp. 2d 1155, 1163–67 (C.D. Cal. 2012).  Accordingly, the Court will **DENY** Unilever's Motion as to Count Seven.

### G.    Plaintiffs' Breach of Express Warranty Claim Survives (Count Eight)

Plaintiffs' express warranty claim survives in New Jersey, New York, and California, which apply the same law to breach of express warranty.[16]  An express warranty arises from an affirmation of fact or promise about the goods that becomes part of the basis of the bargain.  The

---

[16] Because Unilever seeks to dismiss Plaintiffs' breach of warranty claims "without regard to which state's law applies, this Court need not conduct a full choice of law analysis" at this time. *Scheuerman v. Nestle Healthcare Nutrition, Inc.*, No. 10-3684, 2011 WL 13146734, at *6 n.15 (D.N.J. Aug. 1, 2011).

governing standard is materially the same in all three states.  *Sabatano v. Iovate Health Scis. U.S.A. Inc.*, No. 19-08924, 2020 WL 3415252, at \*5 (S.D.N.Y. June 22, 2020) (noting that the Uniform Commercial Code's express-warranty provision was "adopted by both California and New York" in identical terms (quoting Cal. Com. Code § 2313(a); N.Y. U.C.C. Law § 2-313(a))); *Scheuerman*, 2011 WL 13146734, at \*6 (D.N.J. Aug. 1, 2011) (noting that New Jersey and California's express warranty statutes are both based on the Uniform Commercial Code).  The elements for an express warranty claim are materially the same in all three states:  (1) affirmation, (2) breach, and (3) resulting injury.  *See id.*

Unilever argues that "hypoallergenic" and "sensitive skin" are too indefinite to be a warranty, invoking California's requirement of a "specific and unequivocal" statement.  Mot. at 35.  To support this, Unilever cites *Hauter v. Zogarts*, 14 Cal. 3d 104 (1975), and *Watkins v. MGA Entm't, Inc.*, 574 F. Supp. 3d 747, 756 (N.D. Cal. 2021).  The Court is unpersuaded.

*Hauter* found an express warranty as a matter of law from a label statement and held that even an opinion can become a warranty if it is the basis of the bargain.  14 Cal. 3d at 112, 115–17. *Hauter*, however, did not create the heightened "specific and unequivocal" pleading rule that Unilever cites it for.  Mot. at 35; *see Hauter*, 14 Cal. 3d at 112–17.  In *Watkins*, the court held that "Age 3+" is a bare recommendation that asserts no testable product attribute.  574 F. Supp. 3d at 756.  By contrast, the Product's "hypoallergenic" does more than that:  it makes the kind of specific, potentially falsifiable claim that a factfinder may find misleading.  *See supra* Section III.B.  Thus, the express warranty claim survives in all three states.  The Court will **DENY** Unilever's Motion as to Count Eight.

### H.    Unjust Enrichment (Count Nine)

Plaintiffs plausibly plead that Unilever is liable for unjust enrichment based on the Product's "hypoallergenic" label.  To plead an unjust enrichment claim, Plaintiffs must allege that "(1) at plaintiff's expense (2) defendant received benefit (3) under circumstances that make it unjust for defendant to retain benefit without paying for it."  *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 544 (D.N.J. 2004); *see Arlandson v. Hartz Mountain Corp.*, 792 F. Supp. 2d 691, 710 (D.N.J. 2011) (collecting cases showing that "numerous courts have held that unjust enrichment laws do not vary in any substantive manner from state to state").

Unilever argues that "Plaintiffs' unjust enrichment claims are identical to their claims for breach of warranty, and having an adequate remedy at law, their unjust enrichment claims must be dismissed."  Mot. at 37–39 (citing *Santiago v. Total Life Changes LLC*, No. 20-18581, 2021 WL 5083835, at *6 (D.N.J. Nov. 2, 2021) (internal quotation marks omitted)).[17]  "[A]s a general matter, courts only dismiss claims, not remedies, at this early stage," and a plaintiff may plead unjust enrichment in the alternative under Rule 8(d)(2).  *Rains*, 2023 WL 6234411, at *10 (citations omitted); *see Zabransky*, 2025 WL 943091, at *13–14 (permitting alternative pleading because "what a claimant may recover is distinct from what a claimant may plead").  The unjust enrichment claim may stand alongside other legal theories at this stage.

As to the unjust enrichment claim brought under New Jersey law, Unilever invokes the rule that a consumer who buys through a retailer confers no direct benefit to the manufacturer.  Mot. at

---

[17] Unilever also contends that Plaintiffs' unjust enrichment claim is "duplicative of their consumer deception and fraud claims and must be dismissed for that reason."  Mot. at 38–39.  But what a claimant may *recover* is distinct from what a claimant may *plead*, and Federal Rule of Civil Procedure 8(d) permits alternative and inconsistent pleading of claims.  *Gap Properties, LLC v. Cairo*, No. 19-20117, 2020 WL 7183509, at *4 (D.N.J. Sept. 17, 2020) (citing Fed. R. Civ. P. 8(d)(2), (3)) (emphasis added).

38–39 (citing *Snyder v. Farnam Cos.*, 792 F. Supp. 2d 712, 723 (D.N.J. 2011)).  This Court rejected that bright-line rule in *Rains* and will do so again here.  "[T]he key evaluation criterion is whether the relationship would create a reasonable expectation of benefit between the parties."  *Rains*, 2023 WL 6234411, at *11 (citation omitted).  Such an inquiry, however, is never reached where, as here, "the defendant is not merely an innocent third party."  *Zabransky*, 2025 WL 943091, at *14. Therefore, the Court will **DENY** Unilever's Motion as to Count Nine.

## I.     Plaintiffs' Common-law Fraud and Fraudulent Concealment Claim Fails (Count Ten)

New Jersey, New York, and California all require scienter for common-law fraud.  *See Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 172 (2005); *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (2009); *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996). Fraudulent concealment claims likewise require scienter.  See *State, Dep't of Env't Prot. v. Ventron Corp.*, 94 N.J. 473, 503 (1983); *High Tides, LLC v. DeMichele*, 88 A.D.3d 954, 957 (N.Y. App. Div. 2011); *Tenet Healthsystem Desert, Inc. v. Blue Cross of Cal.*, 245 Cal. App. 4th 821, 844 (2016).    Because Plaintiffs fail to plead scienter, their common-law fraud and fraudulent concealment claim fails in all three States on that element.[18]

Unilever argues that the Complaint pleads no "strong inference" of fraudulent intent and that the Complaint's allegations that it "knew the nature of the Product" are conclusory.  Mot. at 26–30.  Plaintiffs counter that knowledge and intent may be alleged generally under Rule 9(b), that their allegations about Unilever's knowledge suffice, and that a premium-charging motive supplies the inference of intent.  Opp'n at 26–35.

---

[18] Accordingly, the Court does not consider the other elements of Plaintiffs' common-law fraud and fraudulent concealment claims.

The Court has already discussed why Plaintiffs fail to plausibly allege scienter. *See supra* Section III.C.2. Without a plausible allegation that Unilever knew the Product's label was false, there is no "strong inference" of fraudulent intent. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec.*, LLC, 797 F.3d 160, 176 (2d Cir. 2015). The Court will **DISMISS** Count Ten *without prejudice*.

## IV.    CONCLUSION

For the reasons above, the Court will **GRANT in part** and **DENY in part** Unilever's Motion to Dismiss. All dismissals are *without prejudice*. In summary, the Court will:

**DISMISS** Counts One (UCL) and Two (FAL).

**DISMISS** Plaintiffs' omission theory in Count Six (NJCFA).[19]

**DISMISS** Count Ten (Common-law Fraud and Fraudulent Concealment) without prejudice.

**DENY** the Motion as to Counts Three, Four, Five, Seven, Eight, and Nine, and **DENY in part** as to Count Six.

An appropriate Order accompanies this Opinion. Plaintiffs will have 30 days from the entry of the Order to file an amended complaint.

Dated:    June 30, 2026

Evelyn Padin, U.S.D.J.

---

[19] Plaintiffs' NJCFA affirmative misrepresentation theory survives.